# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| V. ) | |
| ) | Docket No. 23-CR-10299-FDS |
| DEAN A. TRAN, ) | |
| ) | |
| Defendant ) | |

## GOVERNMENT'S TRIAL BRIEF

The United States, by its undersigned attorneys, respectfully submits this trial brief to identify relevant issues regarding the trial scheduled to begin on September 3, 2024.

1. <u>The Indictment and Summary of Government's Case</u>

   a. *The Indictment*

On November 16, 2023, the grand jury returned an indictment charging 28 counts against the defendant, Dean A. TRAN. The indictment includes twenty-five counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts One – Twenty-Five), and three counts of filing a false tax return, in violation of 26 U.S.C. § 7206(1) (Counts Twenty-Six – Twenty-Eight).

   b. *The Government's Case*

The indictment arises from the defendant's fraudulent collection of unemployment benefits during the COVID-19 pandemic while he was gainfully employed by an automotive parts company (the "Automotive Parts Company"), and his filing of false and fraudulent tax returns that materially underreported rental property income and his income from the Automotive Parts Company.

## The Defendant Committed Pandemic Unemployment Assistance Fraud

From about March 2021 and through about September 2021, the defendant defrauded the Massachusetts Division of Unemployment Assistance ("DUA"). The DUA is a state agency that administers unemployment benefits in the Commonwealth of Massachusetts. (Indictment, ¶ 3). The defendant defrauded DUA by filing false and fraudulent claims for pandemic unemployment assistance ("PUA") benefits while working for the Automotive Parts Company. (Indictment, ¶¶ 7-8).

Congress created PUA as part of the Coronavirus Aid, Relief, and Economic Security Act ("CARES" Act), which was signed into law on March 27, 2020. (Indictment, ¶ 11). PUA was intended for individuals who otherwise were not eligible for traditional unemployment benefits, like gig workers, independent contractors and self-employed workers. (Indictment, ¶ 11). In Massachusetts, eligibility for PUA was verified against quarterly earnings reports of W-2 wage earners provided by employers to the Commonwealth of Massachusetts. (Indictment, ¶ 11). Even though PUA was federal program, it was managed and administered by state unemployment agencies like DUA. (Indictment, ¶ 12).

Individuals requesting PUA filed their claims electronically. (Indictment, ¶ 13). As a part of the initial application, claimants were required to meet certain eligibility criteria, to provide their reason for unemployment, and to certify that they met the program's requirements. (Indictment, ¶ 13). Once approved for the program, claimants had to submit weekly online certifications certifying that they had not worked in the previous week and that they had not received any income during that week. (Indictment, ¶ 14).

The defendant originally filed for traditional unemployment insurance ("UI") benefits on January 6, 2021, the day after his term with the Massachusetts State Senate ended. (Indictment,

¶ 15). On March 12, 2021, the Commonwealth advised him that his unemployment claim had been denied because, as a former State Senator, he was not eligible for traditional unemployment benefits under Massachusetts law. (Indictment, ¶ 16).

*The Defendant Worked Simultaneous to Receiving Unemployment Benefits*

Two days after this denial, on March 14, 2021, the defendant accepted a consulting position with the Automotive Parts Company. (Indictment, ¶ 17). On March 16, 2021, the defendant executed an independent consulting agreement (the "Consulting Agreement") with the Automotive Parts Company earning $90 per hour for his services. (Indictment, ¶ 18). As part of the Consulting Agreement, the defendant agreed to timely file tax returns and make required payments associated with the fees he earned under the Consulting Agreement:

> (c) Consultant is solely responsible for, and will file, on a timely basis, all tax returns and payments required to be filed with, or made to, any federal, state or local tax authority with respect to the performance of services and receipt of fees under this Agreement. Prior to commencing any work under this Agreement, Consultant shall provide Client with a duly executed IRS Form W-9.

(Indictment, ¶ 19).

The term of the Consulting Agreement was for three months until June 16, 2021. The defendant and the Automotive Parts Company agreed to extend the term, which ended on or about September 17, 2021. (Indictment, ¶ 20).

In order to get his $90-per-hour fee, the defendant regularly sent invoices to the Automotive Parts Company. (Indictment, ¶ 20). According to those invoices, the defendant used a variety of names for his consulting services, including "DT Consulting Product and Project Consultant," "DT Consulting Product and Project Management," and "DT Consulting Agile and Scrum Management." (Indictment, ¶ 20). The defendant's invoices show that he commenced work as early as March 20, 2021. (Indictment, ¶ 21). The first invoice that he sent

3

to the Automotive Parts Company was dated April 4, 2021 and the defendant reported fees of $5,355 for work he claimed to have performed between March 20, 2021 and April 3, 2021. (Indictment, ¶ 21).

The defendant continued earning income as a consultant until around the time of September 17, 2021, when he began working as a W-2 employee for the Automotive Parts Company. (Indictment, ¶ 22). Thereafter, the defendant received regular paychecks from the Automotive Parts Company and was no longer paid as a consultant pursuant to invoices that he submitted to the company. (Indictment, ¶ 22).

*The Defendant's Application for PUA Benefits Was False*

On March 15, 2021, which was one day after he accepted the consulting position, the defendant applied for PUA benefits, claiming that he satisfied the following eligibility criteria for benefits, "a child or other person in my household for which I am the primary caregiver is unable to attend school or another facility that is closed as a direct result of the COVID-19 public health emergency and such school or facility care is required for me to work." (Indictment, ¶ 23). The defendant was approved for PUA benefits and he received payments between March 2021 and December 2021 totaling approximately **$43,925.** (Indictment, ¶¶ 24-25). The defendant received these PUA benefits – benefits specifically designated for Americans unable to work during COVID-19 – at the same time that he collected consulting fees totaling approximately $82,602 from the Automotive Parts Company. (Indictment, ¶ 25).

*The Defendant's PUA Benefits Were Briefly Suspended*

At one point while the defendant was receiving PUA benefits, DUA briefly suspended his payments. (Indictment, ¶ 26). Rather than stop his fraudulent scheme at that point, the defendant doubled down and appealed his suspension, while his fraudulent scheme deepened.

4

The defendant submitted a sham employment letter (the "Food Company Offer Letter") from a New Hampshire-based company that produced Asian foods (the "Food Company"). (Indictment, ¶ 27). The Appeal Letter offered the defendant an annual salary of $120,000. The defendant also misled DUA by writing in his appeal letter, "[m]y situation has not changed." (Indictment, ¶¶ 27-28).

The defendant knew this statement was false. (Indictment, ¶ 28). The defendant's situation had changed because by April 12, 2021, the defendant was able to work and was working for the Automotive Parts Company. (Indictment, ¶ 28). The defendant also participated in a recorded telephone hearing as part of his PUA appeal. (Indictment, ¶ 29). During the hearing, the defendant concealed the fact that since at least March 20, 2021, he was regularly working for the Automotive Parts Company and that he had received income from the Automotive Parts Company as early as May 4, 2021. (Indictment, ¶ 30).

On June 9, 2021, the defendant's PUA benefits were reinstated. (Indictment, ¶ 31). He received retroactive benefits for the period when his benefit payments had been suspended. (Indictment, ¶ 31). He continued receiving payments through September 9, 2021, at which time the DUA ceased PUA benefit payments for participants. (Indictment, ¶ 32).

The defendant falsely and fraudulently obtained the PUA benefits because (a) he claimed to not be working on weekly certifications while he worked for the Automotive Parts Company; (b) he claimed to not be earning income while he was receiving payments from the Automotive Parts Company; and (c) he claimed that COVID-19 prevented him from working, but he was working for the Automotive Parts Company as early as March 20, 2021. (Indictment, ¶ 33).

An example of the numerous false weekly certifications from the defendant for the week ending September 4, 2021 is excerpted below:

5

![Earnings and Other Income form screenshot showing two questions about work/telework and other income between August 29, 2021 and September 4, 2021, both answered "No"]

(Indictment, ¶ 34).

After the defendant's PUA benefits ran out on September 9, 2021, just eleven days later, on September 20, 2021, the defendant switched from being a consultant for the Automotive Parts Company to being a W-2 wage earner, with numerous benefits including health insurance, life insurance and retirement benefits. (Indictment, ¶¶ 36-38). If the defendant had become a W-2 employee of the Automotive Parts Company prior to September 2021, the defendant's wages would have been reported to the state and DUA thus would have disqualified from receiving PUA benefits. (Indictment, ¶ 39).

### *The Defendant Fraudulently Concealed Rental and Consulting Income*

Since at least 2017, and for calendar years 2017, 2018, 2019, 2020, 2021, 2022, the defendant and his wife filed tax returns as "married filing jointly." (Indictment, ¶¶ 40-42). The defendant submitted the returns electronically using a third-party tax return program. (Indictment, ¶ 42).

In 2020, 2021 and 2022, the defendant filed materially false and fraudulent returns by not reporting all of the income that he earned from a rental property that he owned in Fitchburg, Massachusetts. (Indictment, ¶¶ 43-45). In 2020, the defendant underreported rental income by approximately $13,444. In 2021, the defendant underreported rental income by approximately $15,255. (Indictment, ¶ 45). In 2022, the defendant underreported rental income by approximately $15,600. (Indictment, ¶ 45).

In addition to willfully omitting the rental income from his returns, the defendant omitted the $54,270 he made from the Automotive Parts Company in consulting fees in 2021. (Indictment, ¶ 46).

2. Anticipated Evidence

    a. *Unemployment Fraud*

In addition to live witness testimony, the government expects to introduce copies of the defendant's application for traditional unemployment insurance benefits and the denial of this application. The government expects to introduce copies of the defendant's application for PUA benefits, copies of weekly certifications filed by him and bank records showing the unemployment income that he received. The government will further introduce records from the Automotive Parts Company, including the defendant's consulting agreement, emails between the defendant and the Automotive Parts Company, invoices submitted by the defendant, and checks from the Automotive Parts Company to the defendant for consulting services. The government will introduce copies of the defendant's bank records, email correspondence and other documents to show that the defendant switched his job classification with the Automotive Parts Company as a consultant to a W-2 wage earner around the time his PUA benefits terminated.

The government will prove the defendant's intent to defraud as to the wire fraud charges through several means, including the defendant's false and fraudulent application for PUA benefits, his false and fraudulent weekly certifications and false and fraudulent statements made by him as part of his PUA benefits appeal. The defendant's application for PUA benefits was false and fraudulent because he applied for unemployment one day *after* accepting a position to commence employment with the Automotive Parts Company. The application was also false because he claimed four dependents on his PUA application, but the PUA program allowed

dependents to be claimed on only one unemployment claim. One of the four dependents claimed by TRAN had separately applied for and received PUA benefits. Therefore, the claim of four dependents was materially false and fraudulent. Moreover, the defendant's weekly certifications were false and fraudulent because TRAN claimed he was not working nor earning income at the same time that he in fact was working as a paid consultant for the Automotive Parts Company.

The government will also introduce text messages and emails between the defendant and the defendant's sister, T.M., related to the unemployment fraud scheme. These statements are not hearsay because they are not offered to prove the truth of the matter asserted. These statements are instead offered to prove the effect on the listener, i.e. TRAN. Such out-of-court statements are not hearsay. *United States v. Cruz-Diaz*, 550 F.3d 169, 176-77 (1st Cir. 2008) (citing and quoting *United States v. Bailey,* 270 F.3d 83, 87 (1st Cir.2001) (noting a statement "offered to show the effect of the words spoken on the listener (e.g., to supply a motive for the listener's action)" is not hearsay)). Moreover, such text messages and emails are also admissible under Fed. R. Evid. 801(d)(2)(D) because with respect to the unemployment fraud, the evidence shows that the defendant's sister acted as an agent for TRAN and the statements were made within the scope of the principal-agency relationship and during the time period of that relationship.

 b. *Tax Fraud*

In addition to live witness testimony, The government expects to introduce copies of the defendant's tax returns for 2020, 2021 and 2022. The government expects to introduce summary charts regarding the income actually earned by the defendant and compared to what he reported on his tax returns. The government expects to introduce the defendant's bank records to show the consulting income and rental income that he earned that he did not report on his tax returns. The

government expects that individuals who lived at the defendant's rental properties during the relevant time period will testify.

    *c. Recordings*

The government anticipates introducing an audio recording of the defendant's interview with agents through SA Christina Rosen, Department of Labor-OIG. The government will also provide a transcript of the interview recording for the jury's use during the trial. The government also anticipates introducing an audio recording of the defendant's appeal hearing before the DUA. The government will also provide a transcript of the unemployment hearing recording for the jury's use during the trial.

    *d. Revenue Agent Testimony*

The government anticipates offering testimony by IRS Revenue Agent Colleen Ranahan, who will testify regarding her review of the defendant's tax returns and bank records. Ms. Ranahan is expected to testify about the defendant's reported income. She is expected to testify about her analyses of the defendant's bank records, and determination of rental and consulting income that he did not report, and the additional tax due and owing. The government expects to introduce summary charts regarding the defendant's tax fraud through Ms. Ranahan.

The foregoing summary is not an exhaustive list of each and every item of evidence that the government may introduce in its case-in-chief, but is provided as a general guide and roadmap of the case. The government reserves the right to modify its presentation of evidence on an as-needed basis as the trial proceeds.

3. <u>Motions in Limine, Witness List, Exhibit List, Voir Dire, Jury Instructions</u>

The government has filed its motions in limine, witness list, exhibit list, proposed voir dire questions and proposed jury instructions in accordance with the Court's Pretrial Order.

4. Special Arrangements

a. *Paralegal*. The government respectfully requests that, in addition to trial counsel, the Court allow Michael Petow, a paralegal from the United States Attorney's Office, to sit at counsel table. Mr. Petow will assist in introducing exhibits into evidence.

b. *Witnesses*. Depending on witness schedules and the actual date that trial testimony commences, the government may request that certain witnesses be allowed to testify out of order.

c. *Case Agent*. The government requests that the Court designate Department of Labor-OIG Special Agent Christina Rosen, as the case agent. The government requests that SA Rosen be permitted to sit at counsel table to assist government counsel during the trial.

d. *Length of Trial*. The government expects its case-in-chief to last five to seven days, excluding jury selection.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By: */s/ John T. Mulcahy*
Dustin Chao
John T. Mulcahy
Assistant United States Attorneys

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ John T. Mulcahy*
John T. Mulcahy
Assistant U.S. Attorney
Dated: August 8, 2024